# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# KNOXVILLE DIVISION

| | |
|---|---|
| ARNOLD BROWN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:18-CV-00205 |
| ) | *Jury Trial Demanded* |
| NORFOLK SOUTHERN RAILWAY ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM IN SUPPORT OF NORFOLK SOUTHERN RAILWAY COMPANY'S MOTION TO PRECLUDE CERTAIN TESTIMONY FROM PLAINTIFF'S ECONOMIST, J.P. GRINGAS

Comes the Defendant, Norfolk Southern Railway Company ("Norfolk Southern"), by and through counsel, pursuant to Federal Rule of Evidence 403, 702, and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and their progeny, and moves the Court to preclude Plaintiff's economist, J.P. Gingras ("Mr. Gingras"), from giving certain opinions in this matter.

## INTRODUCTION

Norfolk Southern is specifically seeking to limit the scope of Mr. Gingras's testimony regarding the present value calculation for the future cost of Plaintiff's LifeCare plan. This calculation was rendered by Mr. Gingras under a presumption of two differing life expectancy scenarios:

1. Scenario #1 – "a total estimated life expectancy of 83.02 years old [for Plaintiff]."

2. Scenario #2 – an "assumed total life expectancy for [Plaintiff] of 95.76 years old."

While there is some evidence that Scenario #1 may be supported by "a level of certainty of 50%," the same cannot be said about Scenario #2. According to Mr. Gingras' own calculations, there

1

exists only about a 5% probability (chance) that a male Plaintiff's age will achieve a life expectancy to age 95.76. Further diminishing the statistical likelihood of Scenario #2 is the unfortunate fact that Plaintiff is a paraplegic, and any presumption that such a condition will enable him to outlive 95% of his demographic is simply unrealistic and represents gross speculation against a backdrop where damages must be proven to a degree of reasonable certainty. Because the 95.76-year life expectancy under Scenario #2 is wholly speculative, and also fails to account for the particular facts of this case, any LifeCare plan calculation from Mr. Gingras based on this presumption should be excluded by the Court as patently unreliable and inherently misleading to the jury. Of course, such a ruling would still permit Plaintiff to move forward with Mr. Gingras's Scenario #1.

## RELEVANT FACTS

This action, arising under the Federal Employment Liability Act ("FELA"), involves a serious and life-altering injury sustained by Plaintiff while working as an employee for Norfolk Southern. (*See*, ECF Doc. 1, Complaint). The incident occurred while Plaintiff and other members of his "maintenance of way" rail gang were performing routine maintenance on a section of railroad track in Mingo County, West Virginia. (*Id.* at ¶ 25). Each member of the gang had an assigned task, including Plaintiff, whose job was cutting rail using a rail saw, which was connected by a "boom" to a large cribber machine. (*Id.* at ¶ 23). As a train was traveling on the track immediately adjacent to where Plaintiff was making his cuts, (*Id.* at ¶ 30), Plaintiff allowed the boom to which his rail saw was attached to foul the track where the train was traveling. (*See*, ECF Doc. 8, Answer, ¶ 8). The passing train struck the saw handle, causing the rail saw to swing around and strike Plaintiff in the back. (Compl., ¶ 30). Tragically, the force of the impact damaged Plaintiff's spinal cord, resulting in permanent paralysis. (*Id.*).

Paralysis has caused Plaintiff to lose all feeling in his body from the waist down. (*See*, Exhibit 1: Brown Depo., 15:22-16:5). He does not have any strength or stability, and he shakes "really bad." (Brown Depo., 16:6-20). Plaintiff can no longer control his bowels or his bladder; he has lost all sexual functioning; and, routine catheter use causes him to suffer constant urinary tract infections. (Brown Depo., 17:6-18:7). His legs and feet are swollen with fluid, making them larger than normal, and require him to wear large Velcro shoes. (Brown Depo., 21:12-23).

One of two nurses from a home health agency visits Plaintiff's residence for three hours every evening, usually from around 6:00 to 9:00 p.m. (Brown Depo., 56:8-14). The nurses help Plaintiff perform basic tasks like using the bathroom, taking a shower, and getting dressed. (Brown Depo., 27:1-5; 56:8-14). The nurses also help with routine chores like cleaning the house, feeding the dog, and running to the store. (Brown Depo., 57:3-6). Since first returning home from the hospital, the nurses have been around to take care of just about anything Plaintiff requests.[1] (Brown Depo., 56:25-57:1; 58:5-7).

The permanency of Plaintiff's condition means he will likely require some level of in-home care for the rest of his life. To establish the present value of a LifeCare plan, as well as the present value of Plaintiff's future "loss of household services," [2] Plaintiff retained the expertise of J.P. Gingras ("Mr. Gingras"). (*See*, Exhibit 2: Expert Report). Mr. Gingras holds himself out as a certified public accountant, who has "regularly engaged in the practice of accounting for more than 20 years." (*Id*. at p. 9). His wealth of accounting experience is certainly not cheap, as Plaintiff has agreed to compensate Mr. Gingras at a rate of $595 per hour, on top of a flat fee of $7,500. (*Id*. at

---

[1] Since the incident, Norfolk Southern has paid for almost all of Plaintiff's medical expenses, including the care provided to Plaintiff by these nurses. (*See*, Brown Depo., 58:5-13).

[2] While Norfolk Southern believes Mr. Gingras's calculations for Plaintiff's purported future loss of household services are improper, they are not the subject of this Motion.

p. 8). What Mr. Gingras has given to Plaintiff in return is an overinflated valuation for the future cost of a LifeCare plan, which he accomplished through a highly speculative and factually unsupported assumption regarding Plaintiff's potential life expectancy.

Despite Mr. Gingras's representation that "[n]o expert opinion is expressed as to the appropriate life expectancy specific to [Plaintiff] within [his] Expert Report," (*Id*., p. 7), a close review of his underlying methodology shows this is not the case. In calculating the cost of Plaintiff's LifeCare plan, Mr. Gingras used two different life expectancy scenarios for Plaintiff. Under Scenario #1, Mr. Gingras presumed that Plaintiff, who was "63.62 years old" at the time of the calculation, would have a life expectancy of "19.40 years," thereby attributing him with "a total estimated life expectancy of 83.02 years old." (*See*, Note 1 to Sch. 1 LCP Valuation – 50%; *see also*, Sch. 5 Life Expectancy). In contrast, under Scenario #2, Mr. Gingras applied an "assumed total life expectancy for [Plaintiff] of 95.76 years old." [3] (*See*, Note 1 to Sch. 2 LCP Valuation – 95%; *see also*, Sch. 5 Life Expectancy). By combining Scenario(s) #1 and #2, Mr. Gingras calculated the present value for the future cost of Plaintiff's LifeCare plan to be between $4,327,369 (on the low-end), and a staggering $14,739,189 (on the high-end), with a "rounded average" of $9,530,000.

These calculations are summarized by the following chart, which is contained within Mr. Gingras's Expert Report:

---

[3] In contrast to the total life expectancy in Scenario #1, which took Plaintiff's age and remaining years into account, the Scenario #2 total life expectancy of 95.76 years is speculatively based on a 5% probability of males living to that age. (*See*, Sch. 5 Life Expectancy).

| | | |
|---|---|---|
| | MR. ARNOLD BROWN | |
| | ECONOMIC ANALYSIS OF MR. BROWN'S MEDICAL LIFE CARE PLAN | |
| DATE OF CALCULATION - SEPTEMBER 13, 2019 | | |
| Future Cost of Medical Life Care Plan Valuation (Beginning January 1, 2020) | | |
| Present Value of Future Cost of Medical Life Care Plan - Scenario # 1 (Lower / Lower / Lower) | | $ 4,327,369 |
| Present Value of Future Cost of Medical Life Care Plan - Scenario # 2 (Higher / Higher / Higher) | | 14,739,189 |
| | Rounded Average | $ 9,530,000 |

(*See*, Expert Report, p. 3). To demonstrate, Mr. Gingras's low and high-end cost calculations are further laid out in the spreadsheet on the following page:

MR. ARNOLD BROWN
MEDICAL LIFECARE PLAN VALUATION SUMMARY
DATE OF CALCULATION - SEPTEMBER 13, 2019

Future Cost of Medical Life Care Plan - Excluding Home Care - Present Value

| Years L.E. | Lower Range Present Value of Procedures | Cumulative | Higher Range Present Value of Procedures | Cumulative | Lower Range Present Value of Procedures | Cumulative | Higher Range Present Value of Procedures | Cumulative |
|---|---|---|---|---|---|---|---|---|
| Year 1 | $ 267,336 | $ 267,336 | $ 406,960 | $ 406,960 | $ 266,542 | $ 266,542 | $ 405,751 | $ 405,751 |
| Year 2 | 169,644 | 436,981 | 285,864 | 692,824 | 168,513 | 435,055 | 283,956 | 689,708 |
| Year 3 | 171,416 | 608,397 | 290,660 | 983,484 | 169,641 | 604,695 | 287,649 | 977,357 |
| Year 4 | 173,538 | 781,935 | 295,827 | 1,279,311 | 171,103 | 775,799 | 291,676 | 1,269,033 |
| Year 5 | 182,828 | 964,764 | 310,077 | 1,589,387 | 179,594 | 955,392 | 304,591 | 1,573,623 |
| Year 6 | 199,037 | 1,163,800 | 333,158 | 1,922,546 | 194,789 | 1,150,182 | 326,049 | 1,899,672 |
| Year 7 | 194,709 | 1,358,510 | 330,035 | 2,252,580 | 189,847 | 1,340,029 | 321,793 | 2,221,465 |
| Year 8 | 284,662 | 1,643,171 | 444,706 | 2,697,287 | 276,523 | 1,616,552 | 431,992 | 2,653,457 |
| Year 9 | 207,664 | 1,850,836 | 352,198 | 3,049,485 | 200,978 | 1,817,530 | 340,859 | 2,994,316 |
| Year 10 | 210,074 | 2,060,910 | 358,109 | 3,407,594 | 202,556 | 2,020,086 | 345,292 | 3,339,608 |
| Year 11 | 261,951 | 2,322,861 | 428,026 | 3,835,620 | 251,638 | 2,271,724 | 411,176 | 3,750,783 |
| Year 12 | 223,589 | 2,546,449 | 381,349 | 4,216,969 | 213,989 | 2,485,713 | 364,976 | 4,115,759 |
| Year 13 | 236,183 | 2,782,633 | 400,360 | 4,617,329 | 225,204 | 2,710,917 | 381,749 | 4,497,508 |
| Year 14 | 238,292 | 3,020,925 | 406,426 | 5,023,755 | 226,371 | 2,937,288 | 386,094 | 4,883,602 |
| Year 15 | 360,613 | 3,381,537 | 561,626 | 5,585,381 | 341,301 | 3,278,588 | 531,549 | 5,415,151 |
| Year 16 | 275,492 | 3,657,029 | 462,198 | 6,047,578 | 259,771 | 3,538,359 | 435,822 | 5,850,973 |
| Year 17 | 267,916 | 3,924,945 | 454,384 | 6,501,963 | 251,689 | 3,790,048 | 426,864 | 6,277,837 |
| Year 18 | 270,662 | 4,195,606 | 461,636 | 6,963,599 | 253,325 | 4,043,373 | 432,066 | 6,709,903 |
| Year 19 | 131,763 | 4,327,369 | 259,472 | 7,223,071 | 266,059 | 4,309,431 | 450,973 | 7,160,876 |
| Year 20 | - | - | - | - | 267,983 | 4,577,414 | 457,067 | 7,617,942 |
| Year 21 | - | - | - | - | 333,940 | 4,911,354 | 545,723 | 8,163,665 |
| Year 22 | - | - | - | - | 410,332 | 5,321,686 | 640,830 | 8,804,495 |
| Year 23 | - | - | - | - | 297,347 | 5,619,034 | 504,268 | 9,308,763 |
| Year 24 | - | - | - | - | 299,892 | 5,918,925 | 511,490 | 9,820,253 |
| Year 25 | - | - | - | - | 315,609 | 6,234,534 | 534,996 | 10,355,249 |
| Year 26 | - | - | - | - | 341,864 | 6,576,399 | 572,231 | 10,927,480 |
| Year 27 | - | - | - | - | 332,753 | 6,909,151 | 564,312 | 11,491,791 |
| Year 28 | - | - | - | - | 336,050 | 7,245,202 | 572,857 | 12,064,648 |
| Year 29 | - | - | - | - | 506,706 | 7,751,908 | 789,293 | 12,853,942 |
| Year 30 | - | - | - | - | 355,018 | 8,106,926 | 605,513 | 13,459,455 |
| Year 31 | - | - | - | - | 444,255 | 8,551,181 | 727,546 | 14,187,001 |
| Year 32 | - | - | - | - | 291,606 | 8,842,787 | 552,189 | 14,739,189 |
| | $ 4,327,369 TRUE | | $ 7,223,071 TRUE | | $ 8,842,787 TRUE | | $ 14,739,189 TRUE | |

"Scenario #1"                                   "Scenario #2"

(*See*, LifeCare Plan Summary - Yearly). Since Plaintiff was "63.62 years old" at the time Mr. Gingras rendered his calculations, (*See*, Note 1 to Sch. 1 LCP Valuation – 50%), Plaintiff would be approximately 83.02 years old at Year 19, and 95-96 (i.e. 95.76) years old at Year 32.

The two shorter columns, on the left-side, represent the present value of Plaintiff's LifeCare plan under **Scenario #1**, which assumes that Plaintiff has a life projection to age 83.02. (*See*, Note 1 to Sch. 1 LCP Valuation – 50%). Within this parameter, Mr. Gingras calculated Plaintiff's

5

LifeCare plan will cost between $4,327,369 [4] and $7,223,071. (*See*, LifeCare Plan Summary - Yearly). Under the National Vital Statistics Reports "Mortality Table" relied upon by Mr. Gingras, there is "50% certainty" that the average male, aged 63-64 (i.e. 63.62), will have a 19.4-year life expectancy. (*See*, Note 1 to Sch. 1 LCP Valuation; Sch. 5 Life Expectancy). As such, there exists at least a colorable statistical argument that Plaintiff could live to this age, and Scenario #1 is therefore not being contested in this Motion.

The same, however, cannot be said regarding the longer columns, on the right-side of the above-referenced chart, which represent of the present value of Plaintiff's LifeCare plan under **Scenario #2**. (*See*, LifeCare Plan Summary - Yearly). As previously stated, these calculations rely on a presumption of Plaintiff living to age 95.76, (*See*, Note 1 to Sch. 2. LCP Valuation – 95%), thereby drastically increasing the approximate cost of Plaintiff's LifeCare plan to between $8,842,787 and $14,739,189.[5] (*See*, LifeCare Plan Summary - Yearly). Unlike with Scenario #1, the calculations under Scenario #2 lack even the slightest modicum of reliability, as even Mr. Gingras acknowledges only a 5% probability of Plaintiff living to be 95.76-years-old, (*See*, Note 1 to Sch. 2. LCP Valuation – 95%), which he obtained by reference to the following chart that lists the "probability of being alive":

---

[4] $4,327,369 is used as his low-end figure in arriving at the "rounded average" of $9,530,000. (*See*, Expert Report, p. 3).

[5] Note this $14,739,189 figure is used by Gingras as his high-end figure in arriving at the above-referenced "rounded average" of $9,530,000. (*See*, Expert Report, p. 3).

### MR. ARNOLD BROWN
### LIFE EXPECTANCY ASSUMPTION CALCULATOR
### DATE OF CALCULATION - SEPTEMBER 13, 2019

Table 2. Life table for males: United States, 2015     SCHEDULE 5

| Age (years) | Probability of dying between ages x and x + 1<br>$q_x$ | Number surviving to age x<br>$l_x$ | Number dying between ages x and x + 1<br>$d_x$ | Expectation of life at age x<br>$e_x$ | Probability of Being Alive | Percentage of Certainty that Valuation is Not Understated | | | |
|---|---|---|---|---|---|---|---|---|---|
| 0-1 | 0.006387 | 100,000 | 639 | 76.3 | 99.36% | 0.64% | | | |
| 1-2 | 0.000452 | 99,361 | 45 | 75.8 | 99.32% | 0.68% | | | |
| 2-3 | 0.000277 | 99,316 | 28 | 74.8 | 99.29% | 0.71% | | | |
| 3-4 | 0.000224 | 99,289 | 22 | 73.8 | 99.27% | 0.73% | | | |
| 4-5 | 0.000165 | 99,267 | 16 | 72.9 | 99.25% | 0.75% | | | |
| 60-61 | 0.011413 | 85,842 | 980 | 21.7 | 84.86% | 15.14% | | | |
| 63-64 | 0.014075 | 82,711 | 1,164 | 19.4 | 81.55% | 18.45% | | | |
| 80-81 | 0.057631 | 51,163 | 2,949 | 8.3 | 48.21% | 51.79% | | | |
| 81-82 | 0.064030 | 48,215 | 3,087 | 7.8 | 45.13% | 54.87% | | | |
| 82-83 | 0.070871 | 45,128 | 3,198 | 7.3 | 41.93% | 58.07% | | | |
| 83-84 | 0.078217 | 41,929 | 3,280 | 6.8 | 38.65% | 61.35% | | | |
| 84-85 | 0.086915 | 38,650 | 3,359 | 6.4 | 35.29% | 64.71% | | | |
| 85-86 | 0.096237 | 35,290 | 3,396 | 5.9 | 31.89% | 68.11% | | | |
| 86-87 | 0.107643 | 31,894 | 3,433 | 5.5 | 28.46% | 71.54% | | | |
| 87-88 | 0.120117 | 28,461 | 3,419 | 5.1 | 25.04% | 74.96% | | | |
| 88-89 | 0.133690 | 25,042 | 3,348 | 4.7 | 21.69% | 78.31% | | | |
| 89-90 | 0.148381 | 21,694 | 3,219 | 4.4 | 18.48% | 81.52% | | | |
| 90-91 | 0.164189 | 18,475 | 3,033 | 4.1 | 15.44% | 84.56% | | | |
| 91-92 | 0.181092 | 15,442 | 2,796 | 3.8 | 12.65% | 87.35% | | | |
| 92-93 | 0.199046 | 12,646 | 2,517 | 3.5 | 10.13% | 89.87% | Certainty | | |
| 93-94 | 0.217982 | 10,128 | 2,208 | 3.3 | 7.92% | 92.08% | 95% | Average | |
| 94-95 | 0.237802 | 7,921 | 1,884 | 3.0 | 6.04% | 93.96% | 96.05 | 95.76 | |
| 95-96 | 0.258387 | 6,037 | 1,560 | 2.8 | 4.48% | 95.52% | 95.47 | Years Old | |
| 96-97 | 0.279592 | 4,477 | 1,252 | 2.6 | 3.23% | 96.77% | | | |
| 97-98 | 0.301253 | 3,225 | 972 | 2.5 | 2.25% | 97.75% | | | |
| 98-99 | 0.323192 | 2,254 | 728 | 2.3 | 1.53% | 98.47% | | | |
| 99-100 | 0.345218 | 1,525 | 527 | 2.2 | 1.00% | 99.00% | | | |
| 100 and over | 1.000000 | 999 | 999 | 2.0 | 0.00% | 100.00% | | | |

(Sch. 5 Life Expectancy). Only through this highly speculative assumption regarding Plaintiff's life expectancy was Mr. Gingras able to artificially inflate the median present value of his LifeCare plan up to $9,530,000, as every age added in Scenario #2 has a "probability of being alive" well below 50 percent Given their apparent lack of reliability against the legal backdrop of this case, Mr. Gingras's calculations under Scenario #2 must be precluded in their entirety.

Interestingly, it does not appear that Mr. Gingras made similar attempts to manipulate the present value of Plaintiff's future "loss of household services." For that calculation, the following chart was provided:

### MR. ARNOLD BROWN
### ECONOMIC ANALYSIS OF MR. BROWN'S
### LOSS OF HOUSEHOLD SERVICES VALUATION
### DATE OF CALCULATION - SEPTEMBER 13, 2019

| Loss of Household Services Valuation (Beginning January 1, 2020) | At Average Hourly Rate | Rounded |
|---|---|---|
| Present Value of Lost Household Services at 5% Limitation | $ 233,083 | $ 230,000 |
| Present Value of Lost Household Services at 25% Limitation | 1,165,415 | 1,170,000 |
| Present Value of Lost Household Services at 50% Limitation | 2,330,831 | 2,330,000 |
| Present Value of Lost Household Services at 75% Limitation | 3,496,246 | 3,500,000 |
| Present Value of Lost Household Services at 95% Limitation | 4,428,578 | 4,430,000 |

7

(*See*, Expert Report, p. 3). An attachment to the Expert Report explains that these numbers were generated solely with the presumption that Plaintiff's "assumed estimated life expectancy is 82.44 years old…," (*See*, Note 2 to Loss of Household Services), without any further consideration of, or reference to, a 5% probability that Plaintiff could live to be 95.76-years-old. This is telling.

## LAW & ANALYSIS

Under Rule 702, the proponent of expert testimony bears the burden of showing by a preponderance of the evidence that (i) the expert is qualified, (ii) the testimony is reliable, and (iii) the testimony is relevant and will assist the jury. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–95 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–52 (1999). As a prerequisite to admissibility, Plaintiffs' expert must be qualified to offer relevant testimony and his opinions must be supported by a valid scientific of technical basis. Fed. R. Evid. 702. To be qualified, an expert must possess "knowledge, skill, experience, training, or education" regarding the topics of his testimony. Fed. R. Evid. 702. To be reliable, expert testimony must be "based on sufficient facts or data," and it must be "the product of reliable principles and methods" that have been "reliably applied" to the "facts of the case." *Id*.

In *Daubert*, and later in *Kumho Tire*, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude irrelevant or unreliable expert testimony. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (quoting Advis. Comm. Notes to Fed. R. Evid. 702); *see also Daubert*, 509 U.S. at 592-95; *Kumho Tire*, 526 U.S. at 141-42. This gatekeeping role is critical, because expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595.

*Daubert* provides a nonexclusive list of guideposts a trial court may use in its gatekeeping function: (1) whether the expert's "theory or technique . . . can be (and has been) tested;" (2)

whether the theory or technique "has been subjected to peer review and publication;" (3) whether there exists a high "known or potential rate of error" for a particular technique and the existence of "standards controlling the technique's operation;" and (4) whether the theory or technique enjoys "general acceptance" within the relevant community. *Daubert*, 509 U.S. at 593-94. In addition to those factors, the Sixth Circuit has adopted a fifth guidepost not explicitly stated in *Daubert* or *Kumho*: "the extent to which [the expert's] opinions were prepared in the context of litigation." *Johnson*, 484 F.3d at 430; *see also Kumho Tire*, 526 U.S. at 150 (acknowledging the four *Daubert* guideposts do not constitute "a definitive checklist or test.").

Ultimately, the "gatekeeping" role requires the Court to perform a two-part analysis with respect to the admissibility of expert testimony. First, the Court must determine whether the expert is sufficiently qualified "by reason of training, education, or experience" to render opinions in front of a jury. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592; *Pride v. BIC Corp.,* 218 F.3d 566, 577-78 (6th Cir. 2000). If satisfied that the expert is qualified, then the Court must examine the opinions offered by the expert, along with the bases for those opinions, in order to determine as a threshold matter whether they are sufficiently reliable to be admissible. *Id.* The decision whether to admit expert testimony rests within this Court's sound discretion. *General Elec. v. Joiner*, 522 U.S. 136, 143 (1997); *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

As a final matter, "application of Rule 702 and *Daubert* in this case is not altered in any way by the substantive law governing Plaintiff's claims." *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1352 (M.D. Ga. 2007). While a somewhat relaxed standard of causation applies under the FELA, "the standard of causation under FELA and the standards for admission of expert testimony under the Federal Rules of Evidence are distinct issues and do not affect one another." *Id.* (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 503 (9th Cir. 1994)); *see also Messenger*

9

*v. Norfolk Southern Ry Co.*, 2015 U.S. Dist. LEXIS 27371, at *21 (N.D. Ind. March 15, 2015) ("the standard of causation under the FELA and the standards for admission of expert testimony under the Federal Rules of Evidence are discrete issues and do not affect each other."). Thus, FELA's relaxed causation standard "does [not] mean that in FELA cases courts must allow expert testimony that in other contexts would be inadmissible." *Bowers*, 537 F. Supp. 2d at 1352.

In the instant FELA action, Norfolk Southern is asking the Court to exercise its gatekeeping function by properly limiting the scope of Mr. Gingras's opinions. Specifically, Mr. Gingras should be precluded from offering any calculation under Scenario #2, which is premised on the unlikely probability of Plaintiff living to age 95.76. As an accountant, Mr. Gingras does not possess the requisite qualifications to offer an expert opinion regarding the appropriate life expectancy to be attributed to Plaintiff, and any calculation rendered under Scenario #2 does not pass a reliability analysis. The "Mortality Table" from the U.S. Department of Health and Human Services, which Mr. Gingras relied on and incorporated into his own Expert Report, shows a mere 5% probability of a male living to be 95.76 years old, and the persistent health complications stemming from paralysis will only statistically decrease Plaintiff's life expectancy.

In sum, without any "reasonably certain proof" to substantiate Mr. Gingras's highly speculative assumption that Plaintiff will achieve a life projection to age 95.76, no evidentiary foundation exists to justify an award for the future cost of Plaintiff's Life Care Plan when based on such a presumption. *See e.g.*, *Brown v. Chi. & N. W. Transp. Co.*, 516 N.E.2d 320, 328 (1987) ("We have not hesitated to find that future damages are not recoverable when there has not been reasonably certain proof thereof."); *In re United States Steel Corp.*, 436 F.2d 1256, 1269 (6th Cir. 1970) ("One who is injured in his person by the wrongful act of another may recover loss of time resulting therefrom and consequent loss of earnings, including future earnings, provided they are

shown with reasonable certainty and are not merely speculative in character."); *Weeks Marine, Inc. v. Wright*, 2015 U.S. Dist. LEXIS 91820, at *26 (S.D. Ala. July 15, 2015) (the Court recognizing that, "[a]t the end of the day, it is plaintiff's sole responsibility to prove up his damages with reasonable certainty."); *Trejo v. Denver & R. G. W. R. Co.*, 568 F.2d 181, 184 (10th Cir. 1977) ("In further proceedings the plaintiff should make his position clear and due regard should be had for the principle of reasonable certainty of future damages."); *Lewin Realty III, Inc. v. Brooks*, 771 A.2d 446, 466 (Md. Ct. App. 2001) ("Future damages cannot be recovered if the future consequences upon which the damages are premised are merely possibilities. Sufficient probability exists when there is more evidence in favor of a proposition than there is against the proposition.") (citations omitted); *Kahn v. Southern Pacific Co.*, 282 P.2d 78 (Cal. Ct. App. 1955); *First Nat'l Bank v. Kansas City S. Ry. Co.*, 865 S.W.2d 719 (Mo. Ct. App. 1993) (trial court committed error by permitting life care plan expert or rehabilitation expert to opine that plaintiff could become a paraplegic or be confined to a wheelchair in the absence of medical testimony that such a result was reasonably certain to follow the injury); *Dalebout v. Union Pac. R.R. Co.*, 980 P.2d 1194 (Utah Ct. App. 1999) (Testimony regarding the likelihood of future medical treatment resulting from a railroad employer's negligence must show "a probability rather than a possibility." If the testimony shows a mere possibility, it is inadmissible.); *Strohm v. New York, Lake Erie & W. R.R. Co.*, 96 N.Y. 305 (N.Y. 1884) (consequences that are contingent, speculative, or merely possible are not proper to be considered by the jury in ascertaining damages.)

I. **Mr. Gingras Does Not Possess The Professional Qualifications Or Experience Necessary For Him To Offer An Opinion Regarding Plaintiff's Life Expectancy.**

Mr. Gingras undisputedly lacks the requisite professional qualifications to express an opinion regarding Plaintiff's anticipated life expectancy. When making a preliminary determination regarding an expert's qualifications under Fed. R. Evid. 104(a), the Court is to

examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). Within this framework, "[t]he trial court must determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Id.* In the instant case, Mr. Gingras only holds himself out in his Expert Report as having "education, training and experience in the area of accounting and auditing..." (*See*, Expert Report, p. 9). And, in fact, it would appear that Mr. Gingras indirectly conceded his lack of qualification to express an opinion regarding life expectancy by going out his way to specify that "[n]o expert opinion is expressed as to the appropriate life expectancy specific to [Plaintiff] within [his] Expert Report." (*Id.* at p. 7). Absent some demonstrably relevant knowledge or experience, any presumption by Mr. Gingras regarding Plaintiff's life expectancy is nothing more than pure conjecture and rank speculation.

**II.**  **Mr. Gingras's Valuation Of Plaintiff's LifeCare Plan Is Patently Unreliable To The Extent His Underlying Methodology Is Based Upon A Highly Unlikely (5%) Presumption That Plaintiff Has A Potential To Live To Age 95.76.**

Even if Mr. Gingras is more broadly qualified to calculate the cost of Plaintiff's LifeCare plan, it does not change the fact that his underlying methodology in Scenario #2 incorporates a grossly speculative and highly unreliable presumption regarding Plaintiff's life expectancy. The reliability prong is well-rooted in Fed. R. Evid. 702. *See United States ex rel. Martin v. Life Care Ctrs. of Am.*, 2014 U.S. Dist. LEXIS 142657, at *37 (E.D. Tenn. Sep. 29, 2014). The purpose of this Court's reliability analysis is to focus on the methodology and principles underlying the testimony. *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) (citing *United States v. Bonds*, 12 F.3d 540, 556 (6th Cir. 1993)). Or, as previously summarized by this Court, under Rule 702, "evidentiary reliability" means, essentially, "trustworthiness." *United States v. Pollard*, 128

F. Supp. 2d 1104, 1119 (E.D. Tenn. 2000). "The test of reliability is a 'flexible' one, however, and the *Daubert* factors do not constitute a 'definitive checklist or test,' but must be tailored to the facts of the particular case." *Birge v. Dollar Gen. Corp.*, 2006 U.S. Dist. LEXIS 97195, at *9 (W.D. Tenn. Sep. 28, 2006) (citing *Kumho Tire*, 526 U.S. at 150).

   a. <u>Mr. Gingras's highly speculative presumption regarding Plaintiff's life expectancy is connected to existing data only through the *ipse dixit* of the expert</u>.

Importantly, "[a]ny step that renders the analysis unreliable renders the expert's testimony inadmissible." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir.1999) (internal alterations omitted); *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir.2002) (finding error where the "district court relied solely on [an expert]'s general qualifications without requiring the [party proffering the expert testimony] to explain the method [the expert] used to arrive at his [opinions]"). For this reason, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997). Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. (citing *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, *cert. denied*, 506 U.S. 826 (1992)). It is, therefore, commonly recognized that "[t]he '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (citing *Joiner*, 522 U.S. at 139).

Mr. Gingras's presumption under Scenario #2 that Plaintiff will live to be 95.76-years-old is patently unreliable. Indeed, the pertinent "Mortality Table" from the U.S. Department of Health and Human Services attributes only about a <u>*5% probability*</u> for a typical male living to achieve 95.76 years of age. (*See*, Sch. 5 Life Expectancy). Notably, this is the same exact same "Mortality Table" relied upon by Mr. Gingras in formulating his opinions. (*See*, Note 3 to Sch. 6 Sign. Dates).

13

Yet, in brazen disregard of the non-probable, essentially null, life expectancy rate he uses, and in what can only be described as a complete lack of accountability, Mr. Gingras proceeded to make this highly unlikely presumption a cornerstone of his LifeCare plan calculation. (*See*, Note 1 to Sch. 2. LCP Valuation – 95%). Perhaps most telling is Mr. Gingras's decision <u>not</u> to incorporate this Scenario #2 into his "loss of household services" calculation. (*See*, Note 2 to Loss of Household Services). Given the sheer improbability of Plaintiff living to be 95.76-years-old, "there is simply too great an analytical gap between the data and the opinion proffered," and Scenario #2 of Mr. Gingras's LifeCare plan calculation must be excluded because it is "connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

   b. <u>Mr. Gingras made no attempt to tie his highly speculative presumption regarding Plaintiff's life expectancy to the particular facts or evidence in the present case</u>.

Although consideration of Scenario #2 would be improper for *any* male Plaintiff's age, the unfortunate fact here is that Plaintiff is a paraplegic. By assuming Plaintiff will live to age 95.76, Mr. Gingras failed to account for the facts and circumstances relevant to this case. A key consideration under Rule 702 is whether the expert "has applied the principles and methods reliably to the facts of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed R. Evid. 702). In turn, part of this Court's gatekeeping function is to judge "reliability *in light of the particular facts and circumstances* of the particular case." *Crouch v. John Jewell Aircraft, Inc.*, 2016 U.S. Dist. LEXIS 3528, at *40-41 (W.D. Ky. Jan. 12, 2016) (emphasis included) (quoting *Kumho*, 526 U.S. at 158). And, thus, "one major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011)).

Here, Mr. Gingras offered no factual support in justification his decision to credit Plaintiff with such a long life expectancy under Scenario #2. For instance, it does not appear that Mr. Gingras's presumption was based on an opinion of a properly qualified medical expert. This is likely because any such expert, who reviews Plaintiff's medical chronology from an objective standpoint, would find this evidence only further negates a conclusion that Plaintiff could even remotely (not to mention more likely than not) be among the 5% of males who will reach 95.76-years-old. As discussed, Plaintiff's debilitating injury has caused him to experience a magnitude of health complications, many of which are either ongoing, reoccurring, or continuous. (*See*, relevant excerpts from Exhibit 1: Brown Depo.).

Though unfortunate, the harsh reality is that paraplegia decreases life expectancy; it does not raise it. At the request of Plaintiff's counsel, Dr. Alan Maynard Harben ("Dr. Harben") performed an Independent Medical Exam ("IME") on Plaintiff, on August 29, 2019. (See, Exhibit 3: Harben Depo., 3:12-4:5). The purpose of this IME was for Dr. Harben "to evaluate [Plaintiff] for life care planning purposes." (Harben Depo., 4:11-13). When asked about Plaintiff's life expectancy during his deposition, Dr. Harben agreed that life expectancy for somebody with paraplegia is shortened. (Harben Depo., 53:23-25) ("Q: Would you agree that life expectancy for somebody with paraplegia is shortened? A: Yes."). According to Exhibit 4 (attached herewith), which reflects the same materials in Exhibit 11 to Dr. Harben's deposition, the life expectancy for a spinal cord injury patient of the same age and demographic as Plaintiff is only approximately 12.77 years. (Harben, Depo., 54:1-57:21, and Exhibit 11).

Because an assumption that Plaintiff could potentially have a life expectancy to age 95.76 does not resonate with the facts and circumstances particular to this case, Mr. Gingras's calculation of Plaintiff's LifeCare plan is unreliable to the extent it incorporates Scenario #2.

15

c. <u>Mr. Gingras's highly speculative assumption regarding Plaintiff's anticipated life expectancy is unreliable because it runs afoul of the guidelines set forth in Tennessee's Pattern Jury Instructions</u>.

However, to see why the presumption incorporated through Scenario #2 clearly falters under the Court's reliability analysis, one must look no further than the Pattern Jury Instructions for the State of Tennessee. T.P.I. 14.53, titled "Life Expectancy," reads as follows:

> The life expectancy read to you is not conclusive but is an ***average life expectancy of persons who have reached a certain age***. You should be aware that many persons live longer, and many die sooner, than the average. This figure may be considered by you ***in connection with other evidence*** relating to the ***probable*** life expectancy of [plaintiff] [deceased] including evidence of the [plaintiff's] [deceased's] health, occupation, habits and other activities.

T.P.I. Civil 14.53 (emphasis added). Included as Appendix E to the Tennessee Pattern Jury Instructions is a "Life Expectancy Table" showing the – "average life expectancy" – attributed to various demographics, in different stages in their life. For a white male, who is similar in age to Plaintiff (63.62 years), Appendix E provides that the "average life expectancy" is somewhere in the range of 18.6 and 17.9 years, respectively.[6] *See*, T.P.I. Civil Appendix E.

In other words, applying the 17.9-18.6-year life expectancy from Appendix E, it is reasonable to infer that the <u>*average*</u> white male, similar in age to Plaintiff, will live to be about 82-years-old. Notably, as discussed *supra*, the two low-end figures generated by Mr. Gingras for Scenario #1 to his LifeCare plan calculation are premised on the assumption that Plaintiff has an 83.02-year life expectancy. (*See*, Note 1 to Sch. 1 LCP Valuation – 50%; *see also* LifeCare Plan Summary - Yearly). In conformance with T.P.I. 14.53 and Appendix E, Mr. Gingras's presumption that Plaintiff will live to be 83.02-years-old at least provides a "50% certainty," (*Id.*; *see also* Sch. 5 Life Expectancy), thereby reducing the projected high-end cost of Plaintiff's LifeCare plan from

---

[6] White males age 63 have an 18.6-year average life expectancy, while white males age 64 have an average life expectancy of 17.9 years.

a staggering $14,739,189 to a much more realistic $7,223,071. (*See*, LifeCare Plan Summary - Yearly). Since this reduction much more accurately reflects the baseline parameters established by T.P.I. 14.53, Mr. Gingras's calculation for Plaintiff's LifeCare plan should be limited to the parameters of Scenario #1 accordingly.

> d. <u>The probative value of Mr. Gingras's LifeCare plan calculation is outweighed by the danger of unfair prejudice to the extent it is based on a highly speculative presumption of Plaintiff having living to 95.76 years old</u>.

If for no other reason, Mr. Gingras's calculation of Plaintiff's LifeCare plan must be precluded to the extent such evidence is overly prejudicial. Rule 403 allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Ardingo v. Local 951, United Food & Commer. Workers Union*, 333 F. App'x 929, 938 (6th Cir. 2009). As with expert witnesses, district courts are accorded "wide discretion" in determining the admissibility of evidence under Rule 403. *United States v. Whyte*, 2019 U.S. App. LEXIS 33667, at *16 (6th Cir. Nov. 12, 2019) (quoting *United States v. Abel*, 469 U.S. 45, 54 (1984)). In the context of Rule 403, unfair prejudice "refers to evidence which tends to suggest decision on an improper basis." *Id*. (emphasis included) (quoting *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999).

Allowing Mr. Gingras to speculatively attribute Plaintiff with a life projection to age 95.76 under Scenario #2 is highly misleading to the jury. Once again, it bears reemphasis that only about 5% of males will ever achieve such a life expectancy, and the median life expectancy for Plaintiff's demographic actually projects him living closer to age 82. Moreover, Dr. Harben, who performed an IME on Plaintiff at the request of his own counsel, agrees that life expectancy for somebody with paraplegia is shortened. (Harben Depo., 53:23-25). A more accurate life expectancy for a

17

spinal cord injury patient of the same age and demographic as Plaintiff is approximately 12.77 years. (Harben, Depo., 54:1-57:21, and Exhibit 11). By leading the jury to believe under Scenario #2 that Plaintiff's remaining life expectancy is well-above the median for paraplegics in his demographic, not to mention the median for the average male in the same demographic, this evidence "tends to suggest decision on an improper basis." *See*, *Whyte*, 2019 U.S. App. LEXIS 33667 at *16 (referencing Fed. R. Evid. 403).

## CONCLUSION

For the reasons stated above, Norfolk Southern requests that the Court specifically exclude from evidence any reference or referral to Scenario #2 of Mr. Gingras's LifeCare plan calculation, and/or otherwise limit Mr. Gingras's LifeCare plan calculation to the extent it is premised upon Plaintiff living to an age not reflected by the median life expectancy, as set forth in the pertinent mortality tables.

Respectfully submitted,

BAKER, O'KANE, ATKINS & THOMPSON, PLLP

s/ John W. Baker, Jr., BPR #001261
Emily L. Herman-Thompson, BPR #021518
Debra A. Thompson, BPR # 015683
2607 Kingston Pike, Suite 200
Knoxville, Tennessee 37901-1708
(865) 637-5600
jbaker@boatlf.com
ethompson@boatlf.com

GALLIVAN, WHITE & BOYD

Ronald K. Wray, II, pro hac vice
One Liberty Square
55 Beattie Place, Suite 1200,
Greenville, SC 29601
(864) 271-9580
rwray@gwblawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2020, a copy of the foregoing, ***MEMORANDUM IN SUPPORT OF NORFOLK SOUTHERN RAILWAY COMPANY'S MOTION TO PRECLUDE CERTAIN TESTIMONY FROM PLAINTIFF'S ECONOMIST, J.P. GRINGAS*** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

S/ <u>John W. Baker, Jr.</u>